Carol FLOYD, et al., Plaintiffs,

v.

Iris WAITERS, et al., Defendants.

No. Civ. A. 91–47–2–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Aug. 20, 1993.

napped and raped Carla Floyd's twin sister, Carol Floyd.

Both of these crimes occurred at the "Playhouse," a house on Toombs Street in Bibb County, Georgia. Defendant Iris Waiters, the Security Supervisor for the Board, operated the Playhouse and invited various security guards to join the "club." Waiters, Booker, and other guards used the house for occasional card games, beer drinking, and illicit sex. The Playhouse was used for these activities for over a decade, until it was disbanded in 1989, when Booker's crimes were discovered.

The Board has maintained a security force since 1967. Defendant Waiters was first hired as a Board security guard in 1971 and was promoted to Security Supervisor in 1973. He was terminated from this position in March, 1989, following his arrest for obstruction of justice in relation to Bookers' crimes against the Floyd girls.

Defendant John Nicholson was Waiters' immediate supervisor at the time of these incidents and held the title of Director of Operations. His title has since been changed to Assistant Superintendent for Facilities. He has held this position since August, 1987. His predecessor, defendant Harry Tinker, held the position of Director of Operations from 1976 until his retirement in 1987.

Defendant Thomas Hagler served as Superintendent of Schools for the Bibb County Public School System from 1981 through 1991. Defendant Stephen Massey was the President of the Board at the time at which this action was filed. Defendant Kenneth Bronson is currently employed by the Board as a Campus Police Officer. He formerly held the title of Security Officer.

The evidence shows that in 1984 and 1985, some female students made complaints to Tinker and Waiters that Booker had made suggestive comments to them. The girls were subsequently questioned about their complaints, but no further inquiries were made. Booker was never reprimanded for this conduct.

In addition, Booker was arrested in 1985 for aggravated assault. After an argument with his mistress, he fired his gun through

John Paul Batson, Augusta, GA and Sandra J. Popson, Macon, GA, for plaintiffs.

Randall Dennis Russell, Sr., Jerry A. Lumley, and Wallace Warren Plowden, Jr., Macon, GA, for defendants.

### ORDER

OWENS, Chief Judge.

Before the court is a motion for summary judgment filed by defendants Massey, Hagler, Nicholson, Tinker, and Bronson. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

### FACTS

In February, 1989, defendant William Booker, a security guard for the Bibb County Board of Education ("Board"), falsely imprisoned and assaulted plaintiff Carla Floyd, a fourteen-year-old middle school student. Approximately one week later, Booker kid-

the door of her home, and she filed charges. Waiters and Tinker were aware of the arrest and began an investigation. However, they terminated the investigation after Booker's mistress dropped the charges.

Also, during this time period, there were rumors that Booker was having sex with minor females. These rumors were never substantiated, and neither Waiters nor Tinker conducted any investigation into them. Plaintiffs have produced no evidence of any complaints about Booker's behavior after 1985.

It is undisputed that neither Waiters nor Tinker reported any information about Booker's prior activities to either a higher-ranking administrative official or any member of the Board. There is also no evidence that any administrative official other than Waiters, Booker, and other security guards was aware of the existence of the Playhouse.

Plaintiffs Carla and Carol Floyd, through their next friend, filed this lawsuit on February 5, 1991. In their complaint, they have alleged civil rights violations against defendants Hagler, Nicholson, Bronson, Tinker, Booker, and Waiters, individually and in their official capacities. Defendant Massey has been sued in his official capacity only. Plaintiffs have also filed claims under Title IX and state law against defendants.

Because all defendants have been sued in their official capacities, the Board is a municipal defendant in this case. It has filed a motion for summary judgment on all official capacity claims. This motion has also been filed on behalf of defendants Hagler, Nicholson, Tinker, and Bronson, in their individual capacities.

## DISCUSSION

In this case, plaintiffs are seeking to hold the Board liable as a municipality for the civil rights violations alleged in the complaint. In addition, plaintiffs have filed civil rights claims against defendants Hagler, Nicholson, Tinker, Bronson, Waiters, and Booker, in their individual capacities. Finally, plaintiffs have alleged claims under Title IX and state law against defendants.

## I. MUNICIPAL LIABILITY UNDER § 1983

Plaintiffs have raised two grounds upon which to base municipal liability in this case. They first contend that the Board is liable because defendants Waiters, Nicholson, and/or Tinker had "final policy-making authority" in supervising the Board security force. Second, plaintiffs contend that the alleged civil rights violations in this case were caused by long-standing customs or practices of the Board.

### A. Policy–Making Authority

■ Under this theory of liability, "a municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir.1991). Whether an official has final policy-making authority is a question of state law to be decided by the court. *Id.; see also Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir.1989).

■ Plaintiffs contend that defendants Waiters, Tinker, and/or Nicholson had final policy-making authority with regard to the Board security department. With this authority, these defendants allegedly established customs or practices within the security force that caused the civil rights violations against plaintiffs.

This argument has no merit. Plaintiffs have presented no evidence that any of these defendants had final policy-making authority with regard to security matters. On the contrary, under the Board bylaws, the Board has final policy-making authority over all "organization, management and control of the Bibb County Public Schools." Board Policy 8100; *see also* Ga. Laws 1872, p. 388.

Moreover, the bylaws expressly state that the Board "determines policy, delegates executive, supervisory and instructional authority to its employees, and appraises the results achieved in light of the goals of the school system." Board Policy 8300. Thus, the undisputed evidence shows that the

Board has final policy-making authority over all school matters.

In addition, the chain of command within the Board establishes that Waiters, Nicholson, and Tinker did not have final policy-making authority. Under the official job description of Security Supervisor, Waiters had no authority to establish anything but routine security procedures. Furthermore, Waiters was under the direct supervision of the Director of Operations (Tinker, from 1976–87, and Nicholson, from 1987–89).

The Director of Operations was responsible for planning, organizing and implementing the security program. However, he was also supervised by and required to report to the Associate Superintendent of Finance and Support on all areas of the Operations program. The Associate Superintendent reported to the Superintendent, who then reported to the Board.

Under this command structure, all actions of Waiters, as Security Supervisor, and Nicholson and Tinker, as Directors of Operations, were subject to review by a higher official. Then, ultimately, actions by all employees were subject to review by the Board.

■ When a municipality has the power to review a decision of an official, that official has no final policy-making authority. *See Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir.), *reh'g denied*, 942 F.2d 798 (1991).

> [T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policy-making authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review.

*Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125–28, 108 S.Ct. 915, 925–27, 99 L.Ed.2d 107 (1988)).

Despite this command structure, plaintiffs contend that, in practice, the actions of Waiters, Nicholson, and Tinker were never actually reviewed by the Board and that the security department acted as an independent organization. Thus, according to plaintiffs, these defendants were final policy-makers.

Again, the record does not support this contention. There is no dispute that Nicholson and Tinker, as Directors of Operations, were involved in the operations of the security department. Since the Director of Operations was an administrator outside of the security department, there is no merit to plaintiffs' argument that the department functioned independently from any outside administrative supervision.

In addition, the record shows that actions by Nicholson and Tinker were, in practice, reviewed by the Board. The Director of Operations made a monthly report of the security department's activities to the Board's Fiscal and Support Services Committee. This committee then made a report to the Board. Thus, plaintiffs' contention that Waiters, Nicholson, and Tinker were final policy-makers in any capacity has no merit, and municipal liability cannot be based upon this theory.

### B. Custom or Practice

■ Plaintiffs also contend that municipal liability can be based on a municipal custom or practice.

> To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is so 'permanent and well settled as to constitute a 'custom or usage' with the force of law.'" In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.

*Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991) (cites omitted). Plaintiffs claim that the Board acquiesced in several practices of the security department and consequently, that these practices constitute municipal customs.

First, plaintiffs contend that the Board acquiesced in the security department's operation as an autonomous entity. However, the court has already found that the department did not function independently from the

Board; therefore, this "custom" does not exist.

■ Second, plaintiffs contend that the Board acquiesced in the security department's maintenance of the Playhouse as a sexual retreat for Board guards. In order to establish municipal liability, plaintiffs must show that the Board had actual or constructive knowledge that this practice had become customary among its employees. *Depew v. City of St. Marys*, 787 F.2d 1496 (11th Cir. 1986); *Jones v. City of Chicago*, 787 F.2d 200 (7th Cir.1986).

Furthermore, as stated by the Fourth Circuit in *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988):

> Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them.

*Id.* at 1391 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.1984)).

In this case, there is no evidence in the record that any member of the Board or other high-ranking administrative official knew or had reason to know of the existence of the Playhouse. It was a highly kept secret among certain members of the security department. Thus, the Board did not acquiesce in this "custom".

■ Third, plaintiffs contend that the Board acquiesced in the security department's practice of transporting students off campus in a manner contrary to written Board policies. Official policy for the transportation of students was as follows:

i. Transport students from schools

   (1) Only after receiving a written request from the principal.

   (2) Only if a school administrator or teacher rides with you.

   (3) Only after advising radio control of the starting and finishing mileage.

There was also an unwritten policy that students were only to be transported in official security department vehicles.

There is evidence to support a finding that these procedures were never followed by the security department. Security guards often transported students to various locations when the students were unaccompanied by a chaperon. Furthermore, the guards often used privately-owned vehicles and never reported their mileage. In fact, none of the guards testified that they were even aware of the above procedures.

One could infer from this evidence that the transportation procedures of the security department were persistent and widespread. Thus, the security department's practice of transporting students without a chaperon in privately-owned vehicles contrary to official policy was the custom of the Board. *See Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986).

■ Since the custom of transporting students was contrary to policy, plaintiffs' municipal liability claim in this regard is essentially a claim that the Board failed to train and supervise its security guards in the proper procedures for transporting students off campus and that this failure to train and supervise led to Booker's assaults upon plaintiffs. In order to establish a "failure to train" claim, plaintiffs must establish that the Board was deliberately indifferent to this failure to train and that the failure to train was "closely related to" or actually caused plaintiffs' injuries. *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiffs have failed to meet this burden.

■ The mere fact that the Board acquiesced in the security department's practice of transporting students without chaperons is not sufficient to establish municipal liability. Plaintiffs must also establish an "'affirmative link' between the custom at issue (especially when the custom itself does not establish wrongdoing) and the constitutional deprivation alleged to cast blame on the [municipality]." *Jones*, 787 F.2d at 204 (citing *Oklahoma v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see also*

*Parker v. Williams,* 862 F.2d 1471, 1477 (11th Cir.1989).

Moreover, as stated by the Fourth Circuit in *Spell v. McDaniel,* 824 F.2d at 1390 (citing *Patzner v. Burkett,* 779 F.2d 1363, at 1367 (8th Cir.1985) (emphasis added)):

> This requires first that a specific deficiency rather than general laxness or ineffectiveness in training be shown. It then requires that the deficiency or deficiencies be such, given the manifest exigencies of [security] work, as to make occurrence of the specific [constitutional] violation a **reasonable probability** rather than a **mere possibility.** In common parlance, the specific deficiency or deficiencies must be such as to make the specific violation "almost bound to happen, sooner or later," rather than merely "likely to happen in the long run."

In this case, there is no affirmative link between the security department's practice of transporting students without chaperons and defendant Booker's assaults upon plaintiffs. It is not reasonably probable that a security guard will falsely imprison, assault, and rape a student when he transports her without a chaperon in his privately-owned vehicle.

In addition, in a situation such as this one, where the custom that allegedly caused the constitutional injury is far removed from the injury, plaintiffs must show that there was an " 'extremely high degree' of municipal culpability." *Jones,* 787 F.2d at 205 (quoting *Lenard v. Argento,* 699 F.2d 874, 885 (7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983)).

In *Jones,* one of the plaintiffs was sexually assaulted by a physician during a gynecological examination at a Chicago public health clinic. The accused physician was investigated by his immediate superiors and by the City and subsequently cleared of the charges of misconduct. Shortly thereafter, a second plaintiff was sexually assaulted by the same physician. In their § 1983 complaint against the City of Chicago, both plaintiffs claimed that the City's custom of not requiring the presence of a chaperon during examinations led to the deprivation of their civil rights.

The Seventh Circuit found that there was no specific evidence from which a trier of fact could infer that the City was deliberately indifferent to the first plaintiff's constitutional rights. The first sexual assault was the first incident of its kind to occur at a public health facility in Chicago. Furthermore, the City had no record of prior complaints involving sexual misconduct of either the physician in question or any other City physician. Thus, it was reasonable for the City to expect its physicians to stay within the bounds of their ethical obligations, and there was no reasonable inference of fault on the part of the City to support municipal liability under § 1983. *Id.* at 206–07.

In addition, the Seventh Circuit found that the City could not be held liable for the violation of the second plaintiff's constitutional rights. Although the City had knowledge of a prior incident involving the same physician, this physician was cleared through an investigation. Thus, the City's decision neither to discipline the physician nor to institute a policy requiring the presence of chaperons during this physician's examinations did not establish deliberate indifference. *Id.* at 207.

Likewise, in the case at bar, before defendant Booker was arrested for assaulting plaintiffs, there were no previous reported incidents indicating that the security department's practice of transporting students without a chaperon in privately-owned vehicles was likely to cause students to suffer any constitutional deprivations. Without knowledge of any prior incidents, the Board cannot be said to have shown deliberate indifference to students' constitutional rights. *Thelma D. v. Board of Education,* 934 F.2d 929 (8th Cir.1991).

Furthermore, although Tinker and Waiters were aware that Booker had been involved in prior incidents with female students, *see infra,* they never reported this information to their superiors. Moreover, these incidents were not " 'so widespread and flagrant that in the proper exercise of its official responsibilities the governing body should have known of [the incidents].' " *Thelma D.,* 934 F.2d at 933 (five prior complaints to principal of teacher's sexual abuse was not sufficient to

show widespread misconduct) (quoting *Spell v. McDaniel*, 824 F.2d at 1387).

Hence, Booker's unconstitutional acts against plaintiffs were isolated acts of an employee and, as such, they do not impose municipal liability upon the Board. *See Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

Finally, plaintiffs contend that the Board is liable because Booker's superiors failed adequately to investigate previous allegations of misconduct against him and failed to fire him. However, as the court has already found that Booker's immediate superiors were not final policy-makers, their actions do not constitute a "custom" of the Board. Hence, municipal liability cannot be based upon this contention.

Therefore, plaintiffs have failed to establish that the Board was deliberately indifferent to the constitutional rights of plaintiffs. Defendants Waiters, Tinker, and Nicholson were not final policy-makers, and plaintiffs have not shown that a Board custom or policy caused the constitutional deprivations in question. Accordingly, defendants' motion for summary judgment on plaintiffs' § 1983 claims against all defendants in their official capacities is **GRANTED.**

## II. INDIVIDUAL LIABILITY

Plaintiffs have also filed suit against most of the defendants in their individual capacities.

### A. Thomas Hagler

█ Plaintiffs have produced no evidence that Thomas Hagler, Superintendent of Schools, had any personal involvement with the events giving rise to plaintiffs' complaint. Accordingly, defendant Hagler's motion for summary judgment on all claims against him in his individual capacity is **GRANTED.**

### B. Kenneth Bronson

█ The evidence shows that defendant Bronson had only minimal involvement in the events giving rise to plaintiffs' complaint.

On February 15, 1989, Bronson, a security guard, took plaintiff Carol Floyd into custody after she caused a disturbance at Appling Middle School. Before he could take her home, Bronson was called to Northeast High School to respond to another disturbance. Bronson delivered Carol Floyd into the custody of defendant Booker at Northeast High School and told Booker to take Floyd to her home. Booker subsequently raped Carol Floyd.

These facts do not establish any individual liability on the part of Bronson. There is no evidence that he participated in the rape or that he conspired with Booker in any way concerning this incident. Accordingly, defendant Bronson's motion for summary judgment on all claims against him in his individual capacity is **GRANTED.**

### C. Harry Tinker

█ Plaintiffs contend that defendant Tinker is individually liable for failing to supervise a subordinate, defendant Booker. In *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990), the Eleventh Circuit established the following test for determining supervisor liability:

(1) whether in failing adequately to train and supervise subordinates, he was deliberately indifferent [to the constitutional right claimed to have been violated];

(2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and

(3) whether his conduct was causally related to the constitutional infringement by his subordinate.

*Id.* at 836–37.

In this case, it is undisputed that Tinker was aware of prior incidents in which Booker made improper comments to students. In addition, he was aware that Booker was arrested in 1985 for aggravated assault. In this incident, Booker allegedly shot his security guard weapon through the door of his mistress' home. His mistress subsequently dropped the charges.[1] There were also un-

---

1. Booker was also arrested in 1985 on suspicion    of kidnapping and fornicating with a minor, his

substantiated rumors that Booker engaged in sex with minors.

However, knowledge of these incidents is insufficient to establish supervisor liability under § 1983. *See Jane Doe "A" v. Special School District*, 901 F.2d 642 (8th Cir.1990). In *Jane Doe*, a bus driver who transported handicapped children sexually abused several children. Prior to his arrest, various administrators in the school district received complaints that the bus driver had kissed a boy, used foul language, kissed and kicked a child and given him a "snuggle," put his hand down a boy's pants, and pulled down a boy's pants and spanked him. *Id.* at 644.

The Eighth Circuit found that the evidence did not support a finding that the individual defendants had notice of a pattern of unconstitutional acts by the bus driver or that they were deliberately indifferent to the bus driver's abuse of children. *Id.* at 646. First, most of the acts did not amount to unconstitutional actions, but only amounted to common law torts. *Id.* at 644. Second, of the acts that did possibly amount to unconstitutional actions, there were not enough of them to establish a pattern of unconstitutional actions. *Id.* Third, while the failure of one defendant to investigate the complaint that the bus driver had put his hand down a boy's pants and spanked a boy likely amounted to negligence, this was insufficient to constitute deliberate indifference. Thus, the individual defendants were not liable.

The facts in the case at bar are similar to those in *Jane Doe*. Here, Tinker was aware that Booker had made suggestive comments to a few students. Such activity is not unconstitutional. In addition, he knew that Booker had been arrested for aggravated assault, but the charges were subsequently dropped.

Knowledge of these incidents and awareness of unsubstantiated rumors about Booker's sexual behavior do not establish a pattern of unconstitutional actions. Furthermore, as stated by the Eighth Circuit in *Jane Doe:*

That subsequent events proved [Booker] to be a sexual reprobate, however, should not result in after-the-fact imposition of the requirement of character-discerning omniscience on the part of the individual defendants. . . . Viewed in retrospect, some of [Booker's] pre-arrest conduct portrays his true nature with a clarity that pre-arrest circumstances at the most only hinted at.

*Id.* at 647. Thus, Tinker was not deliberately indifferent to any need to supervise Booker to prevent his subsequent violation of plaintiffs' civil rights.

Moreover, it is also significant that there were no complaints about Booker's conduct for four years prior to the assaults on the Floyd girls. Furthermore, Tinker had retired from the school system more than a year before the assaults occurred. Thus, even assuming that Tinker was deliberately indifferent to a need to supervise Booker in 1985, there is no causal relation between that deliberate indifference and Booker's 1989 assaults.

Accordingly, defendant Tinker's motion for summary judgment on plaintiffs' § 1983 claims against him in his individual capacity is **GRANTED.**

### D. John Nicholson

Defendant Nicholson is not liable for failure to supervise defendant Booker for the same reasons as those stated by the court in addressing the liability of defendant Tinker. In addition, Nicholson did not replace Tinker as Director of Operations until August, 1987. Therefore, none of the prior incidents involving Booker's alleged misconduct occurred during the time in which Nicholson held this position. Furthermore, there is no evidence that either Waiters or Tinker ever informed Nicholson of Booker's prior misconduct.

Since Nicholson had no knowledge of Booker's past misconduct, plaintiffs cannot establish that he was deliberately indifferent to any need to supervise him. Accordingly, defendant Nicholson's motion for summary judgment on plaintiffs' § 1983 claims against him is **GRANTED.**

mistress' daughter. These charges were later determined to be unfounded, and Booker's mis-

tress was charged with giving a false report of a crime.

## III.  TITLE IX CLAIM

[13]  Plaintiffs have also filed a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–88.  They contend that they were victims of intentional discrimination based upon sex by defendant Booker and are therefore entitled to a claim under 20 U.S.C. § 1681.

The Supreme Court, in *Franklin v. Gwinnett County Public Schools*, — U.S. —, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), recently held that a victim of intentional discrimination based upon sex under Title IX has a right to seek compensatory damages for her injuries.  In *Franklin*, a student was subject to continuous sexual harassment and abuse by a teacher.  Other teachers and staff were aware of the abuse but took no action to halt it.  The Court held that the student was entitled to seek compensatory damages under Title IX; however, contrary to plaintiffs' assumption in the case at bar, the Court did not find the school district liable for the teacher's actions.  This question was unresolved in the case.

Under Title IX, "No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal Financial assistance. . . ."  20 U.S.C. § 1681(a).  The definition of a "program or activity" includes "all of the operations of . . . a local educational agency . . . or other school system."

This court finds no basis for plaintiffs' Title IX claim.  Assuming that Booker's assaults on plaintiffs constitute discrimination based upon sex, the Board had no part in this discrimination.  Thus, Booker's actions do not constitute discrimination under a "program or activity" of the Board.

In contrast, the defendant school district in *Franklin* was aware of the sexual harassment against one of its students and did nothing to stop it.  Hence, the teacher's actions could constitute discrimination under a "program or activity" of the Board.

Nonetheless, plaintiffs contend that the court should apply to their Title IX claim in this case the analysis established by the Supreme Court for Title VII claims in *Meritor*

*Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  In *Meritor*, the Court held that common-law agency principles determine whether an employer is liable for acts of sexual harassment committed by its employees.  *Id.* at 72, 106 S.Ct. at 2408.  However, under Title VII, the term "employer" encompasses "any agent of such a person."  42 U.S.C. § 2000e(b) (emphasis added).  Thus, the Court determined that common-law agency principles should govern employer liability.  *Id.*

In Title IX, in contrast, Congress defined "program or activity" to mean, among other things, "operations of . . . a school system."  This definition does not include the agents of such an entity.  Thus, common-law agency principles do not apply to claims under Title IX.

However, even assuming that agency analysis does apply in Title IX cases, an employer is not liable if his employee's conduct falls outside the scope of his employment.  *Mountain v. Southern Bell Telephone & Telegraph Co.*, 205 Ga.App. 119, 421 S.E.2d 284 (1992).  Booker's assaults on plaintiffs were purely personal acts for which the Board is not vicariously liable.  *Id.* at 119, 421 S.E.2d 284.  Therefore, there is no merit to plaintiff's Title IX claims against defendants.  Accordingly, defendants' summary judgment motion on these claims is **GRANTED.**

## IV.  STATE LAW CLAIMS

Plaintiffs have also alleged various state law claims against defendants.  These include claims of assault, false arrest, and sexual battery.  The court finds that these state law claims substantially predominate over plaintiffs' remaining § 1983 claims and are likely to cause confusion to the jury.  Accordingly, the court **DECLINES** to exercise supplemental jurisdiction over all state law claims in this case and **DISMISSES** them **WITHOUT PREJUDICE.**

## *CONCLUSION*

The motion for summary judgment filed by defendants Massey, Hagler, Nicholson, Tinker, and Bronson is **GRANTED** on all claims

filed against these defendants in their official and individual capacities under § 1983. In addition, defendants' motion is **GRANTED** on plaintiffs' Title IX claim.

Finally, the court **DECLINES** to exercise supplemental jurisdiction over plaintiffs' state law claims against **ALL** defendants in this case. Accordingly, these claims are **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**