Martha LEIJA and Jerry Leija, as Next Friends of Rosemarie Leija, a Minor,

v.

The CANUTILLO INDEPENDENT SCHOOL DISTRICT.

No. EP–93–CA–478–F.

United States District Court, W.D. Texas, El Paso Division.

June 9, 1995.

Mark Berry, Christie, Berry & Dunbar, Thomas E. Stanton, El Paso, TX, for plaintiff.

Henry C. Hosford, Baskind, Samaniego & Hosford, El Paso, TX, for defendant.

## *MEMORANDUM OPINION AND ORDER*

FURGESON, District Judge.

### *Introduction*

Rosemarie Leija brought this case under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88. She claimed that, while she was a second grade student in the Canutillo Independent School District, her physical education teacher Tony Perales sexually abused her. At the end of the testimony, this court determined as a matter of law that Miss Leija proved the abuse occurred. The jury was then asked agency questions to determine whether the acts of Coach Perales were to be imputed to the School District, because only an educational institution can be liable under Title IX for acts of intentional discrimination based on sex. In light of the court's view of Title IX, which has evolved since the trial ended three months ago, the court believes that the agency questions were unnecessary. Instead, in cases such as this one, the court believes that the actions of a teacher should be strictly imputed to an educational institution. Con-

currently, the court believes that limitations should be placed on damages.

Although other courts have declined to interpret Title IX as a strict liability statute, *see Howard v. Board of Educ. of Sycamore Community Unit School Dist.,* 876 F.Supp. 959, 974 (N.D.Ill.1995), this court was finally convinced of the correctness of its approach after reflecting on the jury's verdict awarding damages of $1,400,000 on the basis of the standard definitions of mental anguish, pain and suffering. The damages were excessive and unjustified, but not because the jury was inflamed or beset by passion. On the contrary, the jury was conscientious and deliberate. The problem it faced was that it had no clear guidance from the court about how to measure damages, which is certainly needed in cases where little girls are sexually abused by their teachers. With proper instructions, which admittedly go beyond the present general ones, the court firmly believes that juries will do their duty and will render verdicts within proper limits in this category of cases under Title IX. This opinion will suggest those limits, with the ultimate hope that a remedy legislated by the Congress will not be lost because damages cannot be given some rational parameters.

Litigation under Title IX has been a continuing challenge for federal courts, to some extent because of the elegant brevity of the statute. For example, a private cause of action with a damage remedy is not stated in the statute but instead has been implied to exist through court interpretation. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992); *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Since the text of and legislative intent behind Title IX are silent on both the issues of private rights and available remedies, it is "hardly surprising" that the usual sources for guidance on these questions "yield no explicit answer." *Franklin,* 503 U.S. at 76, 112 S.Ct. at 1038 (Scalia, J., concurring). Courts have thus been required to fill the gaps, and the results have not necessarily been uniform. *See, e.g., Chance v. Rice Univ.,* 984 F.2d 151 (5th Cir.1993); *Lipsett v. University of Puerto Rico,* 864

F.2d 881 (1st Cir.1988); *Mabry v. State Bd. of Community Colleges & Occupational Educ.*, 813 F.2d 311 (10th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Floyd v. Waiters*, 831 F.Supp. 867 (M.D.Ga.1993); *Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F.Supp. 1288 (N.D.Cal. 1993). In keeping with the trend, this opinion takes yet another view of Title IX, especially by suggesting an analytical framework which divides Title IX cases into categories.

### Facts

While in the second grade at Canutillo Elementary School in Canutillo, Texas, throughout the 1989–1990 school year, Rosemarie Leija was taught health and physical education by Tony Perales. During that year, Coach Perales sexually molested her while she was in his classroom. For the most part, the abuse occurred while he was showing movies to Miss Leija's class in a darkened classroom. Coach Perales would instruct her to come to the back of the room and sit on his lap. He would then place his hands beneath her undergarments and rub her chest, her buttocks, and between her legs. There was no testimony suggesting penetration. At the minimum, this happened eight times; at the maximum, twenty times. Testimony also indicated that Miss Leija was not the only target of the coach's attentions. He molested her classmate Lizette Soto as well.

Eventually, the two girls reported this matter to their primary teacher, Pam Mendoza, who discounted the girls' story and took no action of any kind to address the matter. She did not, for example, tell any other teacher or administrator about the matter. After the abuse continued, Miss Leija reported the matter to her parents in March 1990, and they then talked to Ms. Mendoza, who advised against stirring up trouble and convinced the parents that nothing was happening anyway. Miss Leija left the school in the third grade and encountered no further problems from Coach Perales.

Later, in the next school year, Coach Perales continued to abuse young girls in his class, to an even greater degree. The par-

ents of the girls initiated complaints to teachers and administrators, who adopted Ms. Mendoza's approach to the problem. Finally, around Christmas of 1990, when a complaint was filed with law enforcement officers against Coach Perales, the District's superintendent was notified and he relieved Coach Perales of his duties. Miss Leija eventually sued the Canutillo Independent School District and Coach Perales, under both Title IX and 18 U.S.C. § 1983. The court entered summary judgment for the defendant School District under section 1983, a default judgment against Coach Perales under section 1983, and a judgment of dismissal in favor of Coach Perales under Title IX because only educational institutions can be sued under the statute. As to suits against institutions only, see *Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1576–77 (N.D.Cal.1993). The School District went to trial before a jury under Title IX.

### The Trial

During trial, the court excluded from presentation to the jury evidence of Coach Perales' abuse against other girls, based in part on its prejudicial impact under Rule 403 of the Federal Rules of Evidence. The jury, however, heard the testimony of Coach Perales and Ms. Mendoza, which consisted mostly of their invocation of the Fifth Amendment. It also heard testimony from Miss Leija, her parents, some school personnel and psychological experts for both sides. Since the court found that Miss Leija proved the existence of sexual abuse as a matter of law, it instructed the jury that she had been the subject of intentional discrimination. The jury was then asked questions on agency to determine if the School District itself could be held liable under Title IX.

After quickly resolving the agency issues in favor of the plaintiff, the jury took over a day to consider damages. Early on, the jury sent a question to the court about damages, based on the fact that, in final argument, plaintiff's counsel had requested relief for $7,000,000. The court's response, although traditional in wording, was clearly less than helpful. The question was:

Judge, we feel a compensation should be awarded, but we feel that $7 million is too much. Some help in determining an amount would be helpful.

The answer was:

You must determine the amount of damages you, the jury, believe is appropriate based on the instructions and the evidence. You are not bound in any way by the arguments of the lawyers as to what they might believe to be appropriate.

The referenced instructions to the jury were the traditional instructions given in federal cases where damages are properly sought for mental anguish.

After agonizing deliberation, the jury found that Miss Leija's past damages were $900,000 and future damages were $500,000. The jury did its best. It needed better instructions; it deserved better instructions. The court firmly believes, with better instructions, the jury would have reached a proper verdict. The next jury to hear the damage proof in this case will receive better instructions.

### Title IX and Strict Liability

Plaintiff argued from the beginning of this case that the court should apply the principles of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, to Title IX analysis. In particular, plaintiff sought to incorporate the agency rules of Title VII into Title IX to impute the acts of Coach Perales to the School District. Although there is some support outside the Fifth Circuit for the application of Title VII principles to Title IX, *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir.1988), the Fifth Circuit has held in clear language that Title IX is to be analyzed under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–7, not under Title VII. *Chance v. Rice Univ.*, 984 F.2d 151 (5th Cir.1993).

The Fifth Circuit decision in *Chance* does not, however, address the issue of imputed liability under Title IX. In the instant case, it must be addressed, because the plaintiff must establish some form of imputed liability or else lose her suit. The court has already granted summary judgment on Miss Leija's

section 1983 claim because the School District's board had no knowledge of the abuse she suffered and therefore could not have been deliberately indifferent to her rights. The question thus becomes whether the intentional discrimination of Coach Perales against Miss Leija, unknown by the school board or administrators of the Canutillo Independent School District, can still be imputed to the District under Title IX.

As briefly stated earlier, the reason the case essentially boils down to the issue of imputed liability is that, at trial, discriminatory intent was shown. Not one witness refuted that the physical sexual abuse of the plaintiff occurred. Miss Leija testified to it. Her classmate testified to it. The School District was unable to rebut it. Coach Perales, the perpetrator, and Ms. Mendoza, plaintiff's teacher, invoked the Fifth Amendment when asked about the abuse. Although Coach Perales had been sued under Title IX, he was dismissed and therefore not a party at trial. The court allowed the jury to receive testimony from Coach Perales and Ms. Mendoza that included their invocation of the Fifth Amendment. To control to a reasonable extent the possible prejudice that can and does arise in such a context, the court required counsel for plaintiff to submit the questions calculated to draw a Fifth Amendment response before either of the witnesses took the stand. Counsel cooperated fully and the court screened the questions. The jury was then told that it could draw a negative inference from the invocation of the Fifth Amendment. *See F.D.I.C. v. Fidelity & Deposit Co. of Md.*, 45 F.3d 969 (5th Cir.1995).

Based on these facts, the court took the matter from the jury's consideration and found that there was intentional discrimination in this case. "[W]hen a teacher sexually harasses and abuses a student," that teacher discriminates on the basis of sex. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992). Therefore, the only question left for resolution was whether the teacher's intentional discrimination against Rosemarie Leija could be imputed to the Canutillo Independent School District.

The proper resolution of this issue has not been self-evident or necessarily obvious. Indeed, the issue of imputed liability is one that plagues courts in all of the broad mass of litigation that fits under the civil rights rubric, including suits under Titles VI and VII of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972 and 42 U.S.C. § 1983. Even when the law regarding imputed liability or its absence is "well settled," such as in section 1983 suits, clear lines of distinction can sometimes be difficult to ascertain. When the statute itself provides for some imputed liability under agency principles, such as in Title VII suits, it can still be difficult to know where to draw the line. *See, e.g., Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Finally, when the statute is silent about the issue of imputed liability, such as in Title VI and Title IX, even more difficulty comes into play. *Compare, e.g., Howard v. Board of Educ. of Sycamore Community Sch. Dist.,* 876 F.Supp. 959 (N.D.Ill.1995); *Hastings v. Hancock,* 842 F.Supp. 1315 (D.Kan.1993); *Floyd v. Waiters,* 831 F.Supp. 867 (M.D.Ga.1993). From reading the cases, it is clear that this court is not the only federal court to engage in a jurisprudential struggle with imputed liability issues under all these statutes. We have each utilized various traditional analytical methods in coming to terms with the statute. This court's way is to establish categories of analysis for assistance in focusing the issue.

### A. *Analysis of Title IX Cases Based on Categories.*

There is precedent for analyzing statutorily-created causes of action by types or categories. One example is *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), where the Supreme Court notes that two types of sexual harassment are actionable under Title VII: (1) where employment benefits are granted in return for sexual favors (now called *quid pro quo* cases) and (2) where improper acts create a hostile working environment (now called hostile environment cases). This differentiation is important for several reasons, and one relates to issues of agency. Under the *quid-pro-quo* category of cases, the actions of the employer's agents or supervisory personnel are to be imputed to the employer, "whether or not the employer knew, should have known, or approved of the supervisor's actions." 477 U.S. at 71, 106 S.Ct. at 2407. On the other hand, under the hostile-environment category of cases, the actions of the employer's agents are not to be imputed unless the employer knows of the harassment. *Id.* Just as analysis by category now makes a difference in Title VII cases because of *Meritor,* it should likewise make a difference in Title IX cases. In light of this view, it is the court's opinion that Title IX cases are properly analyzed under two categories: (1) relationships and (2) type of discrimination.

Intentional sexual discrimination under Title IX can arise in the following relationships: (1) the school and an employee, (2) the school and a student, and (3) one student and another student. As to the third relationship, see *Doe v. Petaluma City Sch. Dist.,* 830 F.Supp. 1560 (N.D.Cal.1993). There can be several types of school discrimination: (1) denial of access to the school or the school's programs, normally but not always at the higher education level, (2) physical sexual abuse, or (3) non-physical but sexist harassment. These two categories (relationship and type of discrimination) probably do not exhaust the field, but the court draws the distinctions because of its belief that each distinction requires a separate analysis. For example, a case of discrimination brought by a teacher against a school district is different from a case of abuse brought by a student against a school district, and a case of access to a school or program is different from a case of sexual abuse. Although such distinctions may not create uniformity across the broad spectrum of Title IX litigation, some uniform analysis may be appropriate as to some combined categories, such as explicit sexual abuse of a student at the elementary and secondary and perhaps college levels. *See* comments in *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 467 n. 5 (5th Cir.1994) (*en banc*) (Garwood, J., dissenting in part) (addressing a claim under 42 U.S.C. § 1983).

### B. *One of the Core Categories of Title IX Cases.*

Without question, one of the core objectives of Title IX is to provide relief to young

girls sexually abused by their male teachers at schools receiving federal funds. This category of cases will be referred to as "teacher-student sexual abuse" cases. It is true, of course, that there can be varying degrees of sexual abuse, from the very intrusive to the intrusive, but all degrees are objectionable.

No opinion polls are necessary to get a fix on this question. The American public has zero tolerance for sexual abuse of little girls, whether by teachers or others; their Congress has zero tolerance as well; hence, Title IX reaches this conduct with the full weight of its purpose. This being said, it should also be said that neither the American public nor their Congress nor Title IX promotes witch hunts of any kind. Allegations of teacher-child abuse should be carefully stated and carefully scrutinized; nonetheless, the unfortunate fact is that little girls (and little boys) are sometimes sexually abused by their teachers. When they are, Title IX provides an effective remedy to address the problem. As to the existence of abuse in the schools, *see* Carrie N. Baker, Comment, *Proposed Title IX Guidelines on Sex–Based Harassment of Students,* 43 EMORY L.J. 271, 276–78 (1994).

It was not until the Supreme Court decision in *Franklin* in 1992 that lawyers, litigants and judges grasped the full availability of Title IX remedies. *See also Pfeiffer v. Marion Ctr. Area Sch. Dist., Bd. of Sch. Directors for the Marion Ctr. Area Sch. Dist.,* 917 F.2d 779 (3d Cir.1990). Before *Franklin,* cases of this nature were generally filed under 42 U.S.C. § 1983. Since the principle of *respondeat superior* does not apply under section 1983 to suits against governmental entities, like school districts, relief was seldom granted in such suits, even when some relief seemed justified. *See Doe v. Taylor Independent Sch. Dist.,* 15 F.3d 443 (5th Cir.1994) (*en banc*). In a thorough casenote written about the initial decision in *Taylor Independent School District,* the difficult history of section 1983 litigation in student abuse cases is chronicled. Barbara L. Horwitz, Note, *The Duty of Schools to Protect Students from Sexual Harassment: How Much Recovery Will the Law Allow,* 62

U.CIN.L.REV. 1165 (1994). The writer observes:

The argument generally accepted by the courts, allowing recovery where the plaintiff shows a pattern of deliberate indifference through policy or custom, has not worked well in providing a means of relief to those whose rights were seriously violated and has certainly not helped to quell the incidence of abuse.

*Id.* at 1222.

In the wake of *Franklin,* future school sexual abuse cases will more likely be litigated under Title IX than under section 1983. While the two statutes have some similarities, their differences are pronounced. The single fact that they were written in different centuries almost 100 years apart accentuates the differences. Section 1983 is a statute that opens a narrow and limited window for recovery in cases where governmental entities or actors are involved in constitutional deprivations. Passed under the spending power of Congress, Title IX deals with intentional torts relating to discrimination on the basis of sex. As different enactments, there should therefore be no presumption that the statutes should have the same attributes. In other words, there should be no requirement that the limitations of section 1983 should be transferred to Title IX. In the court's opinion, they should not. Otherwise, Title IX actions are transformed into section 1983 actions, to the extent the statutes cover the same substantive issues. Certainly, the Congress did not intend to enact Title IX to duplicate section 1983. Such redundancy should not be attributed to the institution created by the first article of the Constitution.

At least one judge on the Fifth Circuit suggests that section 1983 limitations do not apply to Title IX. In her dissent in *Taylor Independent School District,* Judge Jones writes as follows:

Not only is there no broad constitutional purpose to be served by recognizing for Doe's [the claimant-student] benefit a constitutional right not to have her bodily integrity compromised by a teacher's sexual abuse, but the constitutional remedy that the majority strives to assure her is

merely redundant of well-established criminal, tort and statutory sanctions. Coach Stroud [the offending teacher] went to jail for committing statutory rape. Doe [the claimant-student] has state-law tort claims available against [him] for assault and battery and intentional infliction of emotional distress. Most significant, perhaps, is her personal Title IX claim against the school district, which, in exchange for use of federal funds, rendered itself potentially liable for this type of sex harassment case. *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Doe in fact had a Title IX claim pending in state court when this case was orally argued *en banc.*

15 F.3d at 477. Judge Jones' reference to Title IX as a remedy for a sexually abused student is important to this court in light of other observations she makes in her opinion. For one thing, she notes that the coach's conduct in *Taylor Independent School District* cannot be seen by any stretch of the imagination to have been in the scope of his "pedagogical authority." *Id.* at 476. This comment points to a central problem of using agency principles in Title IX cases. No teacher who sexually abuses a student acts in the scope of his authority. No school district anywhere, with or without clearly stated policies on the subject, could ever be found to condone, much less authorize, the sexual abuse of a child as a part of its teachers' duties.

▇ The problem in teacher-student sexual abuse cases is therefore as follows:

(1) only the school district can be liable under Title IX;

(2) only intentional acts of discrimination are reached by Title IX;

(3) the intentional acts can be committed only by the district's employees who will never have authorization to act; so

(4) unless the acts of the employees of the district are fully and strictly imputed to the district, Title IX becomes potentially inoperative.

In teacher-student sexual abuse cases, intentional discrimination can occur only through the intentional acts of a school district's employees. These acts of the employees must accordingly be imputed to the district in a meaningful way, so that the intent of Congress to provide a remedy for intentional discrimination is not thwarted. To be certain that it is not, this court thus believes that acts of employees should be imputed to the school district under strict liability principles. *See* Ronna Greff Schneider, *Sexual Harassment and Higher Education,* 65 Tex.L.Rev. 525, 569–71 (1987) [hereinafter Schneider, *Sexual Harassment and Higher Education*]. In fact, this seems to be the import of Justice White's majority opinion in *Franklin,* where he writes that the availability of damage relief in Title IX cases "will require state entities to pay monetary awards out of their treasuries for intentional violation of federal statutes." *Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037.

There are other alternatives, of course. A "knew or should have known" standard can be utilized, but the very nature of sexually abusive conduct is that it occurs or at least is attempted under cover of secrecy. A school district or its officials will thus hardly ever "know" of the conduct and will not likely be in a position to "should have known." Further, "the standard for the knowledge that [a school] official 'should have' may vary." Kimberly A. Mango, Comment, *Students Versus Professors: Combatting Sexual Harassment Under Title IX of the Education Amendments of 1972,* 23 Conn.L.Rev. 355, 395 (1991) [hereinafter Mango, *Students Versus Professors*]. Also, since a "knew or should have known" approach can result in administrators and others closing their eyes to the problem, it is not an effective way to address the problem. Moreover, the Supreme Court has already rejected this standard in *quid pro quo* cases under Title VII in the *Meritor* decision. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 70–71, 106 S.Ct. 2399, 2407, 91 L.Ed.2d 49 (1986).

Section 219(2) of the Restatement of Agency can also be utilized, because it does provide circumstances where a master is liable for the torts of his servant even when the servant acts outside the scope of his authority. Although more promising, this approach does, in the end, have limits because of the

nature of suits like these. For example, under Section 219(2)(b), liability can be imputed if a school district "was negligent or reckless." However, even if a district has no policy on the subject, can a district ever be negligent or reckless in the face of the fact of abuse, since again it usually happens behind closed doors in secret? In this case, for example, it is not altogether clear that the School District was negligent or reckless. One of its teachers failed to make a report, but is that conduct imputed to the District? Where does the line get drawn: at the teacher, at the principal, at the superintendent, or at the Board? *See Hastings v. Hancock,* 842 F.Supp. 1315, 1318–19 (D.Kan.1993); Mango, *Students Versus Professors,* at 394–95.

Although it is obvious this kind of inappropriate conduct should never happen and would never be condoned by a school system, it unfortunately does happen. Judge Jones examines this exact point in her dissent:

> There is no systemic abuse of institutional power exemplified in this case, because no state agency, school, school superintendent or principal would ever condone what happened to Doe. Similarly, only by *ipse dixit* does the majority support its belief that Stroud's conduct was an abuse of state power. He was committing a crime just as surely as if he had stolen Doe's watch. Ordinarily, a state actor may point to some state policy in support of his actions. A court's job is to say how that proffered policy stacks up against constitutional protections. Here, there is no policy to be tested. The motive for Stroud's conduct was crass self-gratification. The Constitution has little to say about state actors who commit ordinary crimes for their own benefit. *Compare Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). That task is better left to statutory and common law. 'It is no reflection on either the breadth of the United States Constitution or the importance of traditional tort law to say that they do not address the same concerns.' *Daniels,* 474 U.S. at 333, 106 S.Ct. at 666.

15 F.3d at 477. After making this observation, Judge Jones then points meaningfully to the fact that, although the student in *Taylor Independent School District* did not state a section 1983 claim, even against school supervisory personnel, she still had a claim because she sued under Title IX in state court. *Id.*

Of course, this court does not want to read Judge Jones' dissent too broadly or in an unfair way. Still, while noting the limits of section 1983 cited above, she suggests that these limits do not exist under Title IX. In this court's opinion, they do not exist because, at least in regard to teacher-student sexual abuse cases, Title IX should be held to impute the intentional discrimination of a teacher to a school district under strict liability principles. Although this approach in Title VII cases was ultimately rejected by the Supreme Court in the *Meritor* decision, 477 U.S. at 72, 106 S.Ct. at 2408, there are real differences in language and scope between the two statutes that lead this court to believe that the reasoning in *Meritor* in this regard does not apply. The very fact that Title IX deals with children in the classroom instead of adults in the workplace is perhaps the most compelling reason for a different analysis. *See* Joanne Liebman Matson, Note, *Civil Rights—Sex Discrimination in Education—Compensatory Damages Available in a Title IX Sexual Discrimination Claim. Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), 15 U.ARK. LITTLE ROCK L.J. (1993). Moreover, this rule of strict liability is not being implemented across all the categories of Title IX cases; it applies only to children suffering sexual abuse at the hands of their teachers. The standards applicable to other categories must be determined as those fact situations arise.

Defendant School District argues against this approach with vigor. In the first place, it asserts that teacher abuse of children is difficult to detect. With or without regulations and policies on the subject, teachers know abuse is wrong and thus do the acts in secret, as noted earlier. Young children, taught to respect their teachers and follow their teachers' requests, often do not know what to do when abuse occurs, no matter how many group counseling sessions a school might conduct on the subject. To place

strict liability on a district therefore creates liability, according to the argument, even when a school district has done everything in its power to avoid the problem.

Beyond the matters outlined earlier, there are other, countervailing policy considerations that answer this argument. For example, the risk of harm is better placed on a school district than on a young student. To do so heightens the vigilance of the district and causes employees at all levels of the system to be alert to the problem. *See* Schneider, *Sexual Harassment and Higher Education*, at 567–68. The young student, vulnerable in every way, should not be the only effective line of defense or the policing authority. The job of the student, especially the elementary student, is to learn in a trusting environment. As much as possible should be done to achieve this goal and to eliminate any interference with this goal. Given that the overwhelming majority of teachers are above reproach in this area, the problem for school districts should not be institutionally threatening as far as the number of potentially abusive activities is concerned.

Even if the number of incidents may be limited, the School District also argues that strict liability will still be ruinous for districts because they are strapped for funds and simply cannot respond to massive awards in these suits. The $1.4 million verdict in this case is an example of this concern. While it is acknowledged that Canutillo Independent School District is a financially poor school district, even rich districts would be strapped by a verdict of $1.4 million. Certainly, the Congress did not intend for Title IX suits to bankrupt school districts. *See Howard v. Board of Educ. of Sycamore Community Unit Sch. Dist.*, 876 F.Supp. 959, 974 (N.D.Ill.1995). Everyone but a random plaintiff loses in such situations. Just as child abuse should not occur, school districts should not be subjected to potential insolvency when it does occur. For that reason, as set forth below, it is the opinion of the court that damages should be limited in teacher-student sexual abuse cases under Title IX.

## Title IX and Limited Damages

As noted earlier, in the *Franklin* decision, the Supreme Court held that Title IX claimants were entitled to recover damages. In doing so, the Court reaffirmed a principle with "deep roots" in American jurisprudence: "we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 503 U.S. at 66, 112 S.Ct. at 1033. In *Franklin*, the Court cited *Guardians Ass'n v. Civil Serv. Comm'n of the City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), where issues of damages were considered and where "multiple opinions" suggested "the difficulty of inferring the common ground among Justices...." 503 U.S. at 70, 112 S.Ct. at 1035. Still, in *Guardians Ass'n*, "a clear majority [of the Court] expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action." *Id.*

It is also no less true that, in *Guardians Ass'n*, the Supreme Court observed that "make whole" remedies "are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its 'power under the Spending Clause to place conditions on the grant of federal funds.'" 463 U.S. at 596, 103 S.Ct. at 3229. Moreover, as Justice White writes in his majority opinion in *Franklin*, some damage remedies, such as back pay, are not appropriate in suits by students under Title IX since students are not being paid by the schools in the first place. 503 U.S. at 75–76, 112 S.Ct. at 1038. Thus, the emphasis must be on the word "appropriate" when considering "any appropriate relief." Correspondingly, "make whole" remedies are not necessarily the norm when "spending statutes" are involved.

Concurring with Justice White's majority opinion in *Franklin*, Justice Scalia, joined by two other Justices, expresses this concern: what the Court's analytical construct comes down to is this: Unless Congress expressly legislates a more limited remedial policy with respect to rights of action it

does not know it is creating, it intends the full gamut of remedies to be applied. *Id.* at 77, 112 S.Ct. at 1039. Justice Scalia continues, suggesting the very approach implemented in this case: "when rights of action are judicially 'implied,' categorical limitations upon their remedial scope may be judicially implied as well." *Id.*

This court agrees. In teacher-student sexual abuse cases under Title IX, appropriate remedies should have "appropriate limitations." The reason is clear. Public education is of critical importance to our Nation. Limited damages under Title IX protect the schools and simultaneously provide relief to sexually abused students. Under such circumstances, the majority and concurring opinions in *Franklin* are closer in philosophy than a first reading might suggest. In cases where rights are implied, "appropriate" remedies will also be implied. Those remedies, to be appropriate, may in certain categories of cases be limited.

■ In regard to Title IX cases involving sexual abuse of school children, the remedy this court deems most appropriate is a limited one that covers (1) the expenses for medical treatment, (2) the expenses for mental health treatment, and (3) the expenses for special education. These three elements of damage are designed to award money to pay for services that are best able to heal the child physically, emotionally and intellectually. The goal is to put money into direct services that focus on the child. The problem is complicated and the proof will often be difficult, because different children respond to abuse in very different ways. Some suffer extensive harm; some do not. *See* Eugene E. Levitt & Cornelia Marè Pinnell, *Some Additional Light on the Childhood Sexual Abuse–Psychopathology Axis,* 43 INT'L J. OF CLINICAL AND EXPERIMENTAL HYPNOSIS 145 (April 1995). The harm is also not limited to emotional issues; it can involve physical issues as well. Tori DeAngelis, *New Threat Associated With Child Abuse,* AMER. PSYCHOLOGICAL ASS'N MONITOR, April 1995, at 1. The child may also have special educational needs that can best be handled in a private school setting that is adapted for students who need special attention. The three elements of damage have short term and potentially long term consequences, but again all are designed to maximize the healing of the child so that the child can realize his or her full potential, in relationships and eventually at work.

Damages of this nature are specific and, to a real extent, limited. Although long term treatment may be required, it still should not cost so much as to impair the ability of a school district to meet the needs of all of its other students. The abused child will be provided for, but not to the detriment of that child's classmates, who do not suffer under the trauma of abuse but nonetheless deserve to have their own educational needs met.

The goal here is that school districts should not be placed in an impossible position under Title IX. This is an era of dwindling public resources. Federal funds are critically important to public schools. These funds must not be rejected because they carry with them the potential of a disastrous damage award, no matter how remote the potential is. Children who are abused deserve a fair opportunity to a full range of treatment, but they are not entitled to "make whole" relief, given the need to protect the schools and their critical mission in our society.

This balancing approach has other, obvious virtues to recommend it. In addition to protecting the schools and aiding the abused child, it should facilitate settlement, which is an important societal and judicial objective. A school will receive a claim and evaluate it. If the claim has no merit, the school will defend against the claim. If the claim has merit or potential merit, the school will investigate the treatment needs of the child and then will discuss settlement within reasonable parameters. The child's family will have the same parameters to analyze and evaluate. No windfalls are possible. Negotiations will center on three specific areas of recovery.

Moreover, by focusing on the treatment needs of the child, the parties can reduce some of the conflict and delay which often arises in litigation. The best interests of the child will be evaluated early. Even if the merit of the claim is unclear, the parties can

still agree to help the child without the specter of a windfall verdict hanging over the collective heads of the school district policymakers.

In light of this court's decision, the damage award by the jury in this case cannot stand. The School District has requested a remittitur, but a remittitur is not appropriate here because there was no proof of how much treatment and assistance Miss Leija needed or will need or what the cost of such treatment and assistance was or will be. Under the circumstances, the court has no choice but to treat the Motion for Remittitur as a motion for new trial on the issue of damages and then grant a new trial. At a new trial on damages, proof can be presented to the new jury on expenses (1) for medical treatment, (2) for mental health treatment and (3) for special education. At the same time, the court can consider the award of legal fees, because the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, authorizes such an award to the prevailing parties under Title IX. It is important to mention the availability of fees to emphasize that limited relief for treatment for the abused student will not be reduced by legal costs.

### Grove City College Issue and Remaining Issues

In one of its arguments for judgment, the School District asserts that, because the specific activity involved in this suit did not receive federal funds, Title IX does not apply. Although the Supreme Court agreed with this argument in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), Congress reversed the interpretation in the Civil Rights Restoration Act of 1987 and said that it is enough that the educational institution, rather than a specific activity of the institution, receives federal funds for liability to attach under Title IX. Therefore, the School District's argument is foreclosed.

In light of this decision, all other pending motions by both Miss Leija and the School District are either overruled or mooted. Subsequent orders will set the case for a jury trial on the issue of damages.

### Conclusion

Although the approach of this court in this case may be unique in the way the concepts are combined, there is nothing new in the individual parts. In her excellent article in Texas Law Review, written before the *Franklin* decision, Professor Schneider writes:

> Thus, there may be some drawbacks to imposing institutional liability in the absence of knowledge of sexual harassment. A compromise position would impose strict liability upon the institution, but would reduce accordingly any monetary award if the institution took action immediately upon discovering the harassment.

Schneider, *Sexual Harassment and Higher Education* at 570. Even though the court does not adopt all of Professor Schneider's recommendations, it does accept her basic approach to liability and damages under Title IX. In addition, the concept of categories of cases used in this opinion is grounded in Chief Justice Rehnquist's analysis in the *Meritor* decision. Justice Marshall's concurrence in *Meritor* forms the basis for the imposition of strict liability. The implied limitation on damages comes straight from Justice Scalia's concurring opinion in *Franklin.*

Under the circumstances, this opinion simply represents an amalgamation of existing pieces of analyses in the general area of federal statutes dealing with discrimination. Moreover, it does not cover the breadth of Title IX cases; instead, it covers only one category of Title IX cases, albeit a very important, core category. Finally, the goal of the opinion is to implement a Congressional statute in a balanced way, with three objectives in mind: to discourage sexual discrimination of students, to heal students who are sexually abused and to protect schools from ruinous judgments. Will it work? The new jury trial in this case on damages will be an early test.