**Tad NELSON, Beverly Nelson and David Nelson,[1] Plaintiffs,**

v.

**ALMONT COMMUNITY SCHOOLS, Almont High School, Jean Schohl, James Jenuwine and Steven Zott, Jointly and Severally, Defendants.**

No. 95–71438–DT.

United States District Court, E.D. of Michigan, Southern Division.

June 26, 1996.

---

1. Beverly Nelson and David Nelson and all of

their claims in this action were dismissed pursu-

ant to the Stipulation of the parties and an Order of Dismissal entered by the Court on May 22, 1996. Thus, Tad Nelson is the only remaining Plaintiff in this action.

John Monnich, Troy, Michigan, for plaintiffs.

Stephanie Neal, Flint, Michigan for Jean Schohl and Gary Collins, Southfield, Michigan, for remaining defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This matter is presently before the Court on two Motions for Summary Judgment: (1) the "Motion for Summary Disposition" filed on behalf of Defendants Almont Community Schools, Almont High School, James Jenuwine and Steven Zott; and (2) the separately-filed Motion for Summary Judgment of Defendant Jean Schohl. Plaintiff has responded to both of these Motions to which response the Defendants have replied.

Having reviewed and considered the parties' respective briefs and supporting documents, and having heard the oral arguments of counsel at the hearing held on May 30, 1996, the Court is now prepared to rule on the subject Motions. This Opinion and Order sets forth that ruling.

### II. PERTINENT FACTS

This sex harassment action arises out of an alleged improper relationship between Plaintiff Tad Nelson and a former English teacher at Almont High School, Defendant Jean Schohl, that lasted for approximately six months from November 1992 until May 1993. Tad Nelson was, at that time, 17 years old, and in the 11th grade at Almont High School. In May 1993, Tad Nelson attempted to commit suicide by taking an overdose Benadryl. When his parents searched his room to find

out what he had taken, they found Tad's journals, and letters and notes evidencing his relationship with Ms. Schohl, one of his teachers.

After Tad attempted suicide, Tad's parents told the doctors who treated him at Lapeer Regional Hospital that they knew that Tad and Ms. Schohl had a "close" relationship which they had thought for some time was getting more and more inappropriate. The letters they found in Tad's room confirmed their suspicions.

It appears that Tad and Jean Schohl's "relationship" started out rather innocently. During the 1992–93 school year, Tad Nelson was in the 11th grade, and in two of Ms. Schohl's classes—American Literature and an independent study hour in which Tad was studying theater of the absurd.[2] Tad had been in Ms. Schohl's 10th grade English class the preceding academic year. When the '92–'93 school year got under way, Ms. Schohl observed what she perceived to be a difference in behavior and demeanor in Tad from what she had observed the previous year. He was more silent and moody in class, did not volunteer as much as he had in the 10th grade, and did not seem to be interacting as much with his classmates. Ms. Schohl viewed herself as a "counselor" of sorts with respect to students who she thought might be having some kind of out-of-school problems. She testified in her deposition that if it looked like a student was troubled by something, she sometimes would write the student a note indicating that she was available if he or she wanted to talk to someone. She did this with Tad, and suggested that if he found it difficult to talk about what was bothering him, that he keep a journal as did her 12th grade English students.[3]

Ms. Schohl testified that she discussed Tad's change in behavior with his mother at a parent-teacher conference and his mother confirmed that Tad's behavior had changed. Ms. Schohl informed Mrs. Nelson that she had suggested the journal as a means for Tad to express his feelings and that while she would not reveal to Mrs. Nelson what Tad wrote about verbatim because she deemed it confidential, if she saw something which raised concerns, she would advise Mrs. Nelson. Ms. Schohl testified that Mrs. Nelson agreed, and that she thought the journal would be a good idea because she was frustrated and did not know what direction she should take with Tad.[4]

The tone and character of Tad Nelson's journal entries, and Ms. Schohl's comments in response, changed over time, with both Schohl and Nelson expressing themselves in even more intimate terms. In addition to the journals, Tad and Ms. Schohl frequently communicated in notes and letters which were passed to one another in school, either surreptitiously in the hallway or by dropping the notes/letters on one another's desks.

The journals, notes and letters indicate that Schohl and Nelson frequently met outside of school, dined together at restaurants, attended concerts and movies together, and exchanged phone calls, notes, cards and gifts. Ms. Schohl even gave Tad her telephone calling card so Tad could call her at her home in Oak Park from his home in Almont, without raising the suspicions of his parents. There was kissing and hugging but no sexual intercourse between the two.

2. For this independent study hour, Tad was assigned to Ms. Schohl's English 12 class, but he worked separately and independently from the 12th graders.

3. As part of their weekly writing assignments, students in Ms. Schohl's 12th grade English classes kept separate journals which were shared exclusively by each individual student and Ms. Schohl. Ms. Schohl would review the student's journal entries and write comments back to the student in the journal.

4. It appears that Ms. Schohl actually kept in regular contact with Mr. and Mrs. Nelson, and true to her word, when Tad wrote in his journal about death and wondering how it would feel to be shot, she contacted Tad's father and suggested that the Nelsons might want to seek some professional counseling for Tad. Mr. and Mrs. Nelson then did follow up on Ms. Schohl's suggestion, and with Tad's agreement, they looked into psychological counseling for Tad in January 1993 (i.e., five months before the suicide attempt). Tad, however, changed his mind about counseling because within two or three weeks, he "felt better".

The journals as well as the deposition testimony of both Schohl and Nelson indicate that the two made conscious, consistent and repeated efforts to keep their relationship secret. Further, both Nelson and Schohl recognized that their relationship was improper and would be disapproved by their respective families and the school administration if it were discovered.

It is undisputed that both Nelson and Schohl expressly denied any personal relationship when they were separately asked direct questions about their relationship by Steven Zott, the high school principal at the time.[5]

Zott testified that he had no idea there was anything improper going on between Ms. Schohl and Tad. He stated that both were well-thought of in the school community. Prior to Tad's suicide attempt, no teachers or students ever reported to him that they suspected impropriety.

The only information that Zott received prior to May 21, 1993 was in January or February 1993. Zott testified that on a few ballots for Almont's "Snowcoming" king and queen, five or six students had written in nominations for Tad and Ms. Schohl. (Almont has a winter dance called the "Snowcoming Dance" patterned after its fall "Homecoming" counterpart, for which the student body elects a queen and king.) Zott testified that this, however, did not raise any suspicions in his mind because as he explained, students did not always take the king and queen elections seriously, and he, himself, had been a write-in nominee several times on student ballots and frequently write-ins would include the names of actors, actresses and even King Kong.

According to Zott, the Snowcoming dance was the following weekend. One of the chaperons at the dance, Dave Farcus, was a minister at the First Congregational Church in town. Zott testified that Rev. Farcus had come to see him during the dance (Zott remained in his office during the dance) and asked him if he thought it was appropriate for a staff member to dance with a student. Zott said that he told Rev. Farcus that actually at times he thought it was good for students to see teachers in a different light and so it really did not concern him if teachers "get out and shake a leg a little bit." Zott testified that Rev. Farcus said he was not talking about "fast" dancing, but rather about "slow" dancing. He then identified the dancers as Ms. Schohl and Tad Nelson.

Zott testified that although he thought that as a minister, Rev. Farcus might be a little "overly sensitive" to the dancing, because of "appearances", he did not want Ms. Schohl and Tad to be the subject of harmful talk around the school. Therefore, he called the two into his office separately on Monday morning and discussed this matter with each, privately and individually. He told them about the slow dancing report and that their names had been on several ballots. Both denied that there was anything going on between them. Schohl pointed out that she had danced with other students at the dance, as well. Zott accepted their denials at face value.[6] No further incidents were brought to the attention of Zott or any other school administrator.

No Almont High School faculty or staff member reported any suspicions of an improper relationship to Zott. Although Nelson admitted that he and Schohl hid the relationship, at his deposition he named a

---

5. Mr. Zott was hired as principal in August 1988. Prior to that time, Zott was a teacher in several other school districts. Immediately before becoming Almont High's principal, Zott worked in the Richmond School District.

   In February 1993, Zott became Almont's Superintendent of Schools, and in March 1993 the principal's position was filled by James Jenuwine. (It appears that Mr. Jenuwine also came to Almont High School in March 1993 from outside of the school district.) Mr. Jenuwine was not aware of any impropriety or rumors of impropriety concerning Nelson and Schohl. He

had no knowledge of their relationship until after Tad's suicide attempt in May 1993 when he sat in on a meeting with Mr. Zott, Ms. Schohl and her teacher's union representatives when Ms. Schohl was suspended.

6. Ms. Schohl's chronology of the ballots and slow dancing differs from Mr. Zott's. According to Ms. Schohl, the slow dancing meeting with Zott occurred in January after a different dance. She stated that the snowcoming dance was not until the end of February or the beginning of March and that was when the ballots were discussed.

number of faculty members who he believed knew of the relationship. However, he had no factual basis for his belief that there were teachers who knew of the relationship; he merely identified teachers whom he believed were social friends of Ms. Schohl and said that because they were friends of Ms. Schohl they must have known.

Nor could Tad identify any student who knew of his relationship with Ms. Schohl. He merely stated that Almont is a small town where everyone knows each other and, therefore, he believed that students must have known based on "just common vibes."

It is undisputed that Tad Nelson never complained about or reported his relationship with Ms. Schohl to Mr. Zott, or any other school administrator, or to the police.

Plaintiff now contends that for nearly two months before May 1993, he wanted to break things off with Ms. Schohl.[7] However, he did not actually do so until May 6, 1993 when he returned to her a locket she had given him and wrote to her that he did not want to continue with their "relationship", and that he was going back to being just another high school student. Ms. Schohl admitted that she had a difficult time accepting his decision. According to Tad, her notes to him following the break-up became more "intense" and he felt that she was pressuring him to continue the relationship. He contends that it was Schohl's refusal to accept his decision to break things off and her continued intensity that drove him to his suicide attempt on May 20, 1993.

Tad contends that the school administrators (Mr. Zott and Mr. Jenuwine) and the school district are responsible for his injuries because they failed to take any actions "for anything they saw or thought could exist". [Plaintiff's Dep. p. 495.][8]

On May 23, 1993, after discovering the journals, notes and cards evidencing Tad's

relationship with Ms. Schohl, Tad's parents informed Mr. Zott of Tad's suicide attempt and requested a meeting with him to discuss Tad and his relationship with Ms. Schohl.

Zott met with the Nelsons on May 25th. Zott testified that in that meeting the Nelsons told him that initially, they were very pleased that Ms. Schohl had seemed to have taken an interest in Tad and his writing abilities. They told Zott that they were aware that Tad had gone places outside of school several times with Ms. Schohl. They also told Zott that they knew that Ms. Schohl had given Tad her telephone calling card number for him to use to call her so that they would not be concerned about long distance telephone bills. The Nelsons showed Zott one letter they had found in Tad's room that was written to him from Ms. Schohl. Zott testified that he was "shocked" by it.

Ms. Schohl was immediately suspended. Tad remained out of school for the few weeks remaining in the school year and completed his semester's work at home. He returned to Almont High School in the fall of 1993 and graduated in June 1994. He attended Western Michigan University during the 1994–95 school year, and in the fall of 1995, Tad transferred to the University of Michigan, where he is currently a student studying English.

Meanwhile, following Ms. Schohl's suspension, the School District, with the cooperation of the Nelsons, conducted an investigation concerning Jean Schohl's activities. Zott then learned from several teachers of their observations in retrospect. He learned that Tad had accompanied Ms. Schohl one night to the home of another teacher, Mr. Davenport. He also learned that Tad and Ms. Schohl had been seen by another faculty member together at a movie. He also learned that while Tad and Ms. Schohl were

---

7. It appears from Ms. Schohl's deposition testimony that Tad did, in fact, tell her in a letter dated March 15 that he wanted to "walk away" from their relationship.

8. Although James Jenuwine, Zott's successor as principal of Almont High, is named as a defendant in this lawsuit, Tad's only basis for Jenuwine's liability is that

"He held an administrative position as well and ... I don't know if he was aware of the relationship at all. Maybe because he came in so late, I think he came in February or January so he may not have had the knowledge that other administrators had."
[Plaintiff's Dep. p. 497.]

on a school field trip to Chicago that the two spent some time alone together in Ms. Schohl's hotel room. Another faculty member also observed Ms. Schohl kiss Tad on the cheek after he had helped her off a bus. None of this information, however, was brought to Zott's or any other administrator's attention before Tad's suicide attempt. Zott testified that had any one of these observations been brought to his attention earlier, coupled with the slow dancing and Snowcoming ballots, he would have given Tad's and Ms. Schohl's relationship a more detailed investigation.

After his release from the hospital, Tad Nelson also informed Steven Zott that Ms. Schohl had had a sexual relationship with another male student, Chris Hines, ten years earlier, in 1983. (this was more than five years before Zott even came to Almont.) Zott contacted Chris Hines and interviewed him concerning that relationship. (Ms. Schohl admitted the relationship and having had sex with Chris Hines when he was a student at Almont.)

According to Zott, Hines told him that he and Ms. Schohl kept their relationship secret. He said he would tell his parents that he was spending the night at a friend's house when he would really be staying with Ms. Schohl. The relationship was discovered when one night, his parents called his friend's house looking for him. When Chris got home, they confronted him and he told them the truth. Because of his parents' adverse reaction to the relationship, Hines broke it off. However, neither Chris, nor his parents, nor anyone else ever reported the matter to the school.

After Zott completed his investigation, the School District prepared tenure charges against Ms. Schohl to have her permanently removed from teaching in the State of Michigan. The tenure charges were scheduled to be presented to the Almont Board of Education on October 18, 1993. However, the day after being served with a copy of the charges, on October 14, 1993, Schohl resigned from the School District. Zott testified that he refused to place any conditions on the resignation, i.e., he refused to agree to a "non-disclosure" agreement. Ms. Schohl was advised upon her resignation that the circumstances of her leaving Almont Community Schools would be reported to any prospective public school employer. Ms. Schohl has not taught in any public school in Michigan since leaving Almont in 1993.

On February 17, 1995 Tad Nelson and his parents initiated this lawsuit against Jean Schohl, Steven Zott, James Jenuwine (Zott's successor as principal of Almont High), Almont High School and the Almont Community Schools (the "School District"). In their First Amended Complaint, Plaintiff alleges one federal claim for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. against the Almont High School and the School District (Count I).[9] They also allege pendant state law claims of "negligence and gross negligence" against Defendant Jean Schohl (Count II), Defendants Steven Zott and James Jenuwine (Count III) and Almont

9. Specifically, the Amended Complaint alleges that "Defendant Schohl's actions created an intimidating, hostile, offensive and abusive school environment in violation of Title IX of the Education Amendments of 1972" and that Defendants Almont Community Schools and Almont High School had constructive knowledge and/or actual knowledge of Defendant Schohl's activities (through knowledge allegedly held by Defendants Zott and Jenuwine) but "failed to take any action to put an end to or prevent the continuation" of them. [First Amended Complaint ¶¶ 48, 52–54.]

Although these allegations may appear to plead a Title IX cause of action against the individual Defendants, as indicated supra, Plaintiffs only assert this claim against the high school and the School District and only seek to recover damages from the two entities. Even assuming that Plaintiffs also intended to assert Title IX claims against the individuals, because only federally funded institutions can be held liable for violation the statute, the individual defendants in this case cannot be held liable under Title IX. See Bougher v. University of Pittsburgh, 882 F.2d 74, 77 n. 3 (3d Cir.1989); Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir.1988); Aurelia D. v. Monroe County Board of Education, 862 F.Supp. 363, 367 (M.D.Ga.1994), rev'd on other grounds, 74 F.3d 1186 (11th Cir.1996). See also, Lillard v. Shelby County Board of Education, 76 F.3d 716 (6th Cir.1996). Although the only issue ruled upon in Lillard was the issue of the proper statute of limitations to apply in Title IX actions, citing Bougher and Lipsett, the Sixth Circuit expressly noted its "strong skepticism that individual defendants can be held liable under Title IX." 76 F.3d at 728.

High School and the School District (Count IV); and an Elliott–Larsen Civil Rights Act claim against all of the Defendants (Count V). Mr. and Mrs. Nelson also alleged a separate count for reimbursement of $1,300.00 for medical expenses they paid for Tad's medical and psychiatric treatment (Count VI). However, as noted *supra*, Mr. and Mrs. Nelson have stipulated to the dismissal of all of their claims in this action.

On March 29, 1996, Defendants filed their motions for summary judgment seeking dismissal of all of Plaintiff's claims in this action. Plaintiff responded to Defendants' Motions on April 15, 1996.

As indicated above, the parties have stipulated to the dismissal of all claims asserted on behalf of Plaintiff Tad Nelson's parents, David and Beverly Nelson. Plaintiff further has stipulated to the dismissal of Almont High School because the school is not a separate entity subject to suit under Section 1132 of the Michigan School Code, M.C.L. § 380.1132. *Id.* Therefore, the claims to be resolved are only Plaintiff Tad Nelson's claims against the Almont Community Schools; School Administrators Steven Zott and James Jenuwine; and Jean Schohl.

## III. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era"

in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[10] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

★ Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

★ The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

★ The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

★ The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

★ The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion

---

**10.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply the foregoing standards in deciding the summary judgment motions in this case.

### B. *PLAINTIFF'S TITLE IX CLAIMS*

"Title IX" prohibits sex discrimination in educational programs and activities which receive Federal funds. Specifically, the statute provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a).

Section 1687 defines "program or activity" for purposes of Title IX coverage. That section provides in pertinent part:

> For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of—
>
> \*    \*    \*    \*    \*    \*
>
> (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or
>
> (B) *a local* educational agency ..., system of vocational education, or other *school system*....
>
> \*    \*    \*    \*    \*    \*

any part of which is extended Federal financial assistance....

20 U.S.C. § 1687 (emphasis added).

Although Title IX does not expressly authorize a private right of action by a person alleging a violation of Section 1681,[11] in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court determined that a private right of action was implied in the statute. In reaching that conclusion, the Court explained, "Title IX was patterned after Title VI of the Civil Rights Act of 1964", and "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been [interpreted and applied]." 441 U.S. at 694–96, 99 S.Ct. at 1956–57. Since Title VI had no express provision of a private remedy but had been construed by the courts as creating a private remedy[12] prior to Title IX's enactment, and because of the drafters' "repeated references to Title VI and its modes of enforcement", the Court "presum[ed]" that the legislators "were aware of the prior interpretation of Title VI and that that interpretation reflect[ed] their intent with respect to Title IX." *Id.* at 697–98, 99 S.Ct. at 1958.

Subsequently, in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Court determined that a private litigant could recover compensatory damages for a violation of Title IX.[13] In reaching that conclusion, again the Court explained, "we presume the availability of *all* appropriate remedies unless Congress

---

**11.** The enforcement and remedy provisions of the statute, 20 U.S.C. §§ 1682–1683, provide only that enforcement of the statute is to be effectuated by the "termination or refusal to grant or continue [Federal financial] assistance" to the educational institution, and that the administrative decision to terminate or refuse continued Federal funding is subject to judicial review pursuant to Title V [the Administrative Procedures Act].

**12.** Specifically, the *Cannon* Court referred to *Bossier Parish School Board v. Lemon*, 370 F.2d 847, 852 (5th Cir.1967), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); *Southern Christian Leadership Conference, Inc. v. Connolly*, 331 F.Supp. 940 (E.D.Mich.1971); and *Gautreaux v. Chicago Housing Authority*, 265

F.Supp. 582 (N.D.Ill.1967). 441 U.S. at 696, n. 20, 99 S.Ct. at 1957, n. 20.

**13.** Prior to *Franklin*, federal circuit courts were divided on whether Title IX authorized an award of damages. The Eleventh Circuit had determined that because Title IX was enacted under Congress' Spending Clause powers, relief was "limited to that which is equitable in nature". *Franklin v. Gwinnett Cty. Public Schools*, 911 F.2d 617, 621 (11th Cir.1990). *See also, Lieberman v. University of Chicago*, 660 F.2d 1185, 1187–88 (7th Cir.1981), *cert. denied*, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). The Third Circuit, however, had determined that compensatory damages were available. *Pfeiffer v. School Bd. for Marion Center Area*, 917 F.2d 779, 787–89 (3rd Cir.1990).

has expressly indicated otherwise." *Id.* at 66, 112 S.Ct. at 1032.

The Court then examined the state of the law when Title IX was passed. It noted that prior to *Cannon,* in three non-Title IX cases in which the Court had found an implied right of action it had approved damages remedies. *Id.* at 71–72, 112 S.Ct. at 1036. Yet, in the two amendments to Title IX enacted after *Cannon,* "Congress made no effort to restrict the right of action recognized in *Cannon* . . . or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right." *Id.*

Thus, the *Franklin* Court determined that there was no basis for finding that Congress limited the remedies available to a complainant in a suit brought under Title IX, *id.* at 71–75, 112 S.Ct. at 1036–37, and by the legislature's silence on the issue, determined that a damages remedy is available for an action brought to enforce Title IX. *Id.* at 75–77, 112 S.Ct. at 1038.

## C. *THE STANDARD OF A SCHOOL DISTRICT'S LIABILITY FOR SEXUAL HARASSMENT UNDER TITLE IX*

The standard of a school district's liability for sexual harassment of a student by a teacher under Title IX is not clear. Defendants in this case argue for a Title VI "intentional discrimination" standard. Plaintiff, on the other hand, seems to advocate a Title VII "knew or should have known standard." [14]

Because the only issue before the Supreme Court in *Franklin v. Gwinnett County Public Schools, supra,* was whether compensatory damages were available as a remedy for sexual harassment under Title IX, the Court did not reach the issue of the standard by which the liability of a school district is to be determined, nor did the Court address the merits of that case.

Factually, *Franklin* involved the allegations of a female high school student that she was subjected to continual sexual harassment by Andrew Hill, a sports coach and teacher employed by the Gwinnett County School District. She alleged that Hill engaged her in sexually-oriented conversations, inquiring about her sexual experiences, that he forcibly kissed her in the school parking lot, and subjected her to coercive intercourse in an empty school office. Franklin further alleged that teachers and administrators became aware of and investigated Hill's sexual harassment of her, but took no action to halt it and discouraged her from pressing charges against Hill.

Franklin subsequently sued the school district and a school administrator. The administrator was dismissed from the lawsuit early on in the litigation. Hill, the alleged sexual harasser, was never made a party to the lawsuit. Thus, the case proceeded only against the school district.

In the Supreme Court, the school district argued that monetary damages should not be available under Title IX because Title IX was enacted pursuant to Congress's Spending Clause power and the Court had ruled in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), that remedies were limited under Spending Clause statutes.

The Court rejected the School District's argument explaining:

> In *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28–29, 101 S.Ct. 1531, 1545–1546, 67 L.Ed.2d 694 (1981), the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was *unintentional.* Respondents and the United States maintain that the presumption should apply equally to *intentional* violations. We disagree. **The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.** See *id.* at 17, 101 S.Ct., at 1540. **This notice problem does not apply in a case such as this, in which intentional discrimination is alleged.** Unquestion-

---

**14.** It is not entirely clear whether Plaintiff actually disputes Defendants with respect to appropriate standard of school district liability. At page 3 of his Brief, Plaintiff states, "An intentional act under Title IX is deemed to exist as a matter of law if ALMONT COMMUNITY SCHOOLS has notice of sexual harassment of student and fails to act."

ably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. 503 U.S. at 74–75, 112 S.Ct. at 1037.

As Plaintiff in this case points out, the operative facts in *Franklin* which created the Title IX cause of action against the school district are that "[Al]though they became aware of and investigated Hill's sexual harassment of Franklin and other female students, teachers and administrators *took no action to halt it and discouraged Franklin from pressing charges against Hill.*" 503 U.S. at 64, 112 S.Ct. at 1031.

In the few years since the *Franklin* decision, federal courts have adopted several different approaches to the standard by which a district may be held liable. Some courts follow the agency principles contained in the *Restatement (Second) of Agency* § 219(2)(b) (essentially a "two-tort" negligent or reckless conduct standard showing the intentional tort of the employee and negligence of the school district) *See e.g., Rosa H. v. San Elizario Indep. Sch. Dist.,* 887 F.Supp. 140 (W.D.Tex. 1995); *Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.,* 900 F.Supp. 844 (W.D.Tex.1995). Others, persuaded by the *Franklin* Court's reference to *Meritor Savings Bank, FSB v. Vinson,* which was a Title VII employment discrimination case, have applied the Title VII standard of employer liability (i.e., "knew or should have known" for hostile environment claims, and strict liability for quid pro quo harassment). *See Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir.1995); *Patricia H. v. Berkeley Unified Sch. Dist.,* 830 F.Supp. 1288 (N.D.Cal.1993). A number of courts, because of the above-quoted discussion in *Franklin* of "intentional" discrimination,

have adopted the Title VI intentional discrimination standard, and require a showing of knowledge or direct involvement by the school district in the discrimination or failure of the school to take appropriate remedial action. *See Oona R. v. Santa Rosa City Schools,* 890 F.Supp. 1452 (N.D.Cal.1995); *Doe v. Petaluma City Sch. Dist.,* 830 F.Supp. 1560 (N.D.Cal.1993); *Howard v. Board of Educ.,* 876 F.Supp. 959 (N.D.Ill.1995); *Letlow v. Evans,* 857 F.Supp. 676 (W.D.Mo. 1994); *Floyd v. Waiters,* 831 F.Supp. 867 (M.D.Ga.1993); *R.L.R. v. Prague Pub. Sch. Dist. I–103,* 838 F.Supp. 1526 (W.D.Okla. 1993). A few courts have applied a "strict liability" standard. *See Leija v. Canutillo Indep. Sch. Dist.,* 887 F.Supp. 947 (W.D.Tex. 1995); *Bolon v. Rolla Public Schools,* 917 F.Supp. 1423 (E.D.Mo.1996).[15]

■ This Court agrees with those courts which apply the Title VI intentional discrimination standard. Intentional discrimination requires either (A) a showing of direct involvement of the school district in the discrimination, or (B) a showing of (1) actual or constructive knowledge on the part of the district of the sexual harassment of a student *and* (2) that the school failed to take immediate appropriate action reasonably calculated to prevent or stop the harassment. As the court explained in *Doe v. Petaluma City School Dist., supra,* "The school's failure to take appropriate action could be circumstantial evidence of intent to discriminate." 830 F.Supp. at 1576.

The Court believes that such an intentional discrimination standard of liability best comports with the Supreme Court's decision in *Franklin.* Furthermore, the *Franklin* court declined to hold that Title IX's prohibitions and remedies are co-extensive with Title VII, *see* 503 U.S. at 65, n. 4, 112 S.Ct. at 1032, n. 4, and the implication of the above-quoted portion of Court's opinion is that they are not. Therefore, the Court rejects the proposition that it would be enough for the plaintiff to show only that the district through the its administrators and teachers by virtue of their positions "knew or should have known"

15. The foregoing demonstrates why there is no merit whatsoever in Plaintiffs' assertion at page 1 of their Brief that "[t]he statement that the Federal Courts are in disagreement regarding the standard to be used in Title IX cases is unsupported."

**1356**

of the harassment of Plaintiff by Defendant Schohl.

In this case, there is no evidence that the school district (or any of its administrators) themselves directly engaged in the sexual harassment of Plaintiff Tad Nelson. Therefore, the only way Plaintiff can make out a claim against the school district for sexual harassment in violation of Title IX is to show (1) that the district had actual or constructive knowledge of the alleged sexual harassment of Tad Nelson by Defendant Jean Schohl *and* (2) that the district failed to take immediate appropriate action.

## D. *TITLE VII SUBSTANTIVE LAW*

■ Of course, before reaching the issue of the school district's liability for the actions of Defendant Schohl, it must first be determined whether Plaintiff can make out a *prima facie* claim of sex harassment by Ms. Schohl. *Franklin v. Gwinnett* teaches that to establish a *prima facie* case of sexual harassment under Title IX, the substantive law developed under Title VII is applicable. As indicated above, the *Franklin* Court relied on Title VII principles in analogizing the student's claim of harassment against her teacher in that case to the claim of an employee against her supervisor, such as that as alleged by the plaintiff in *Meritor Savings Bank, FSB v. Vinson,* a Title VII case. Subsequently, several courts have understood *Franklin* to authorize the application of Title VII law to students' sexual harassment claims against public school teachers. *See, Murray v. New York University College of Dentistry,* 57 F.3d 243, 247–51 (2d Cir.1995); *Davis v. Monroe County Board of Education,* 74 F.3d 1186, 1191 (11th Cir.1996).

There are two recognized variants of sex harassment under Title VII: (1) harassment that creates an offensive "hostile" environment and (2) harassment in which a supervisor demands sexual consideration in exchange for job (or in this case, educational) benefits ("quid pro quo" harassment). *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 618 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). Plaintiff, here, stipulated on the record at the

May 30, 1996 hearing that this is not a "quid pro quo" case; he is pursuing this action only under a "hostile" environment theory (that Defendant Schohl's actions "were so severe, invasive and pervasive that they altered the conditions under which Tad Nelson could attend high school" and "created an intimidating, hostile, offensive and abusive school environment." [First Amended Complaint, ¶¶ 48–49] ).

■ To establish a *prima facie* hostile environment sex harassment claim, the plaintiff must prove that:

(1) he or she was a member of a protected class; [16]

(2) he or she was subjected to unwelcomed sexual harassment in the form of sexual advances, requests, for sexual favors, or other verbal or physical conduct of a sexual nature;

(3) the harassment complained of was based on sex;

(4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's education and creating an intimidating, hostile, or offensive educational environment that affected seriously the psychological well-being of the plaintiff; and

(5) some basis for institutional liability.

*See, Rabidue v. Osceola Refining Co.,* 805 F.2d at 619–621. *See also, Davis v. Monroe County Board of Education,* 74 F.3d 1186, 1194 (11th Cir.1996).

■ With respect to the fifth "institutional liability" element, as indicated above, to establish the liability of the school district in this Title IX case, Plaintiff must prove that the school authorities knew of the charged sexual harassment and failed to implement prompt and appropriate corrective action.

■ A hostile environment Title IX plaintiff can demonstrate that the school district "knew of the harassment" by showing that he/she complained to a school administrator of the harassment or by showing the pervasiveness of the harassment, which gives rise to an inference of knowledge or constructive knowledge. *Davis, supra,* 74 F.3d at 1195.

**16.** There is no dispute that this element is satisfied in this case.

Unlike *quid pro quo* sexual harassment which may evolve from a single incident, sexually hostile or intimidating environments are characterized by multiple and varied combinations and frequencies of offensive exposures which characteristics would dictate an order of proof that placed the burden upon the plaintiff to demonstrate that injury resulted not from a single or isolated offensive indecent comment or conduct but from incidents comments or conduct that occurred with some frequency. *Rabidue*, 805 F.2d at 620. It is for the trier of fact to judge the totality of circumstances from the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances. *Id.* This invites consideration of such objective and subjective factors as the nature of the alleged harassment, the background and experience of the plaintiff, co-workers and supervisors, the totality of the physical environment, the lexicon that pervaded the environs before plaintiff entered into it, coupled with the reasonable expectation of the plaintiff upon voluntarily entering it. *Id.*

This standard is the same standard applied in Michigan under the Elliott–Larsen Civil Rights Act.

The relevant Elliott–Larsen Act sexual harassment provision states:

> (h) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when . . . (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile or offensive employment environment.

M.C.L. § 37.2103(h)(iii).

The only difference between the Michigan statute and the federal standard is that the federal standard incorporates the phrase "unreasonably interfering" while the Michigan statute uses "substantially interfering".[17]

Applying the foregoing standards to the facts of this case, the Court finds that summary judgment on Plaintiff's Title IX claim against the school district (Count I) would be improper in light of a number of issues of material fact.

First, whether Principal Zott had knowledge of Tad Nelson's and Jean Schohl's relationship is a question of fact, and as such, it must be resolved by the trier of fact. *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987). Possible indicia of constructive knowledge of the school district include (1) Mr. Zott's discovery while counting the Snowcoming ballots of the write-in nominations of Tad and Ms. Schohl as Snowcoming King and Queen and (2) Reverend Farcus' report to Mr. Zott that Tad and Ms. Schohl had been slow dancing at the school dance. As indicated, Mr. Zott testified in his deposition that he did not give the Snowcoming write-ins a second thought because there are always some gag nominations and his only concern after the report from Reverend Farcus was that because of "appearances", he did not want Ms. Schohl and Tad to be the subject of harmful talk around school. Nonetheless, it is for the jury to decide whether the write-in nominations and Mr. Farcus' report, in combination, put Zott on notice of a potentially improper teacher-student relationship so as to constitute constructive knowledge of the relationship on the part of the school district.

There is also an issue of fact as to whether Zott acted reasonably after being put on notice by Reverend Farcus and the Snowcoming ballot write-ins. This, too, is an issue that must be resolved by the jury. *Rosa H. v. San Elizario Independent Sch. Dist.*, 887 F.Supp. 140, 143 (W.D.Tex.1995) (whether prompt remedial measures were taken by the school after having been put on notice of sexual harassment of student is for the finder of fact to determine.)

In this case, Mr. Zott called Ms. Schohl and Tad into his office the Monday after the dance and discussed their slow dancing with each, separately. He accepted at face value their denials that there was anything going

---

17. Michigan courts frequently resolve Elliott Larsen issues by reference to the legal standards applied in Title VII cases. *See Rabidue v. Osceo-* la Refining Co., *supra*, 805 F.2d at 617; *Radtke v. Everett*, 442 Mich. 368, 501 N.W.2d 155 (1993).

on between them and did no further investigation into the matter. Had he done a more detailed investigation, Zott could well have discovered other evidence of the relationship, for example, the kissing incident on the Chicago trip and the movie date, and possibly learned of Ms. Schohl's prior relationships with other former students. It is for the trier of fact to assess all of this evidence and determine whether it was reasonable for Zott to merely accept Schohl's and Tad's denials at face value without conducting any further investigation.

Whether Jean Schohl's sexual advances were unwelcomed is also question for the finder of fact. *Yates v. Avco Corp.,* 819 F.2d 630 (6th Cir.1987); *Bougher v. University of Pittsburgh,* 882 F.2d 74 (3rd Cir.1989). Ms. Schohl contends that Tad entirely voluntarily engaged in the activities of which he now complains. Tad contends that he tried to break things off but Ms. Schohl strongly resisted and would not let him end their relationship. Clearly, this is a disputed issue of fact which precludes summary judgment.

For all of these reasons, the Court will deny Defendants' motions for summary judgment as to Plaintiff's Title IX claim against the school district.[18]

### E. *PLAINTIFF'S ELLIOTT–LARSEN CLAIM*

The same material factual issues which preclude summary judgment on Plaintiff's Title IX claim also preclude summary judgment on Plaintiff's Elliott–Larsen claim (Count V), except with respect to Plaintiff's claims against James Jenuwine.[19] Jenuwine was not even at Almont prior to March 1993. Further, by Tad's own admission Jenuwine did not know about relationship because "he wasn't there long enough". Therefore, summary judgment will be entered on Count V in favor of James Jenuwine, only.

### F. *NEGLIGENCE*

■ In Counts II, III, and IV Plaintiff has alleged Michigan state law claims of negligence and gross negligence.

Michigan's Governmental Immunity Statute, M.C.L. § 691.1407, provides, in pertinent part:

(1) Except as otherwise proved in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. . . .

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission or statutorily created task force of a governmental agency shall be immune from tort liability for injuries to persons or damages to property caused by the officer employee or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless to demonstrate a substantial lack of concern for whether an injury results.

(3) Subsection (2) shall not be construed as altering the law of intentional torts as if it

---

18. As noted in note 9 *supra,* individuals cannot be held liable for violation of Title IX. Therefore, there is as matter of law no liability under this claim for individual Defendants Zott and Jenuwine.

19. Unlike Title IX, under the Elliott–Larsen Civil Rights Act, both employers *and* their agents may be held liable for violations of the act.

existed prior to the effective date of subsection (2).

M.C.L. § 691.1407(2), (3).

█ It is well-settled in Michigan that the daily operations of a public school system are governmental functions within the governmental immunity statute. *See, Lee v. School District of City of Highland Park*, 118 Mich. App. 305, 324 N.W.2d 632 (1982), *lv. denied*, 422 Mich. 902, 368 N.W.2d 245 (1985); *Sanders v. Marquette Public Schools*, 561 F.Supp. 1361 (W.D.Mich.1983). The statute also immunizes public school principals and superintendents from claims of negligence. *Giddings v. City of Detroit*, 178 Mich.App. 749, 444 N.W.2d 242 (1989); *Eichhorn v. Lamphere School District*, 166 Mich.App. 527, 421 N.W.2d 230 (1988), *lv. denied* (1988).

█ Application of the governmental immunity statute in this case mandates that Plaintiff's claims of negligence against all Defendants, except Ms. Schohl, should be dismissed. With respect to Ms. Schohl there is a material issue of fact as to whether she was engaged in the exercise of discharge of a governmental function and whether she was acting within the scope of her authority.

### G. *GROSS NEGLIGENCE*

The plain language of the governmental immunity statute also preclude summary judgment for the individual defendants on immunity grounds except for James Jenuwine. As noted above, there is no evidence of Jenuwine's involvement in this matter.

█ By statute, gross negligence that is proximate cause of injury or damage is not shielded by Governmental Immunity. "Gross negligence" means conduct so reckless to demonstrate a substantial lack of concern for whether an injury results. In this case, the Court finds that there are issues of fact as to whether Principal Zott was grossly negligent in his handling of the matter after being put on notice of improper conduct on the part of Jean Schohl, and if he was grossly negligent, was his gross negligence the proximate cause of Tad's injury? The same is

true of Defendant Schohl: Was Jean Schohl grossly negligent? and, if so, was her gross negligence the proximate cause of Tad's injury? These are factual issues that are for the jury to resolve.[20]

Although individual Defendants Zott and Schohl are not entitled to summary judgment on Plaintiff's gross negligence claims on governmental immunity grounds, the school district is immune from liability for gross negligence. As provided in subsection (1) of the immunity statute, all governmental "agencies" engaged in the exercise or discharge of a governmental function are immune from tort liability. M.C.L. § 691.1407(1). Unlike the limitation on the protection afforded employees of government agencies under subsection (2) of the statute, there is no "gross negligence" exception to subsection (1) of the Act.

Therefore, summary judgment will be entered in favor of the school district on Count IV.

### *CONCLUSION*

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment are granted in part, and denied in part. Summary judgment will only be entered in favor of the following Defendants on the following claims:

(1) Summary judgment will be entered on Count V (Plaintiff's Elliott–Larsen claim) in favor of Defendant James Jenuwine, only.

(2) Summary judgment will also be entered on Plaintiff's claims of negligence in Counts III and IV, and on Plaintiff's claim of gross negligence against the Almont Community Schools in Count IV.

IT IS FURTHER ORDERED that Summary Judgment is DENIED with respect to all of Plaintiff's remaining claims/partial claims against Defendants Schohl, Zott and the Almont Community Schools in Counts I,

---

**20.** Even considering the "merits" of Plaintiffs' negligence/gross negligence claims against Defendant Schohl, the parties dispute whether Schohl's actions proximately caused Tad Nelson's injuries. Therefore, on the merits, summary judgment would be improper.

**1360**

II, V, and his gross negligence claim in Count III.[21]

SO ORDERED.

---

**21.** As indicated *supra,* Plaintiff has stipulated to the dismissal of all claims against Almont High School and has further stipulated to the dismissal of all claims asserted by Plaintiffs Beverly and David Nelson. This would include Mr. and Mrs. Nelson's claim for reimbursement for medical expenses in Count VI.